SCHROFF, APPELLEE, *v.* THE FOLEY CONSTRUCTION CO., APPELLANT.

(No. 7256—Decided May 15, 1950.)

*Mr. Gordon Rich* and *Messrs. Bates, Skirvin & Varnau,* for appellee.

*Mr. Robert G. McIntosh,* for appellant.

Ross, P. J.  In this appeal on question of law from the Court of Common Pleas of Hamilton County, the defendant seeks to set aside a judgment in favor of the plaintiff rendered on the verdict of a jury in an action in which the plaintiff seeks to recover compensation for personal injuries and damages to his automobile caused by a collision with the "boom" of a machine used in the excavation of a public highway.

The charges contained in the second amended petition are:  That the defendant, on the 7th of April, 1948, was engaged in putting a sewer in Losantiville road in Hamilton county, Ohio; that defendant knew such road was being used for public travel during such installation; that defendant had not blocked the entrances to such road; that defendant blocked the south half of such road with a "power crane" at a point east of the overhead crossing of the Pennsylvania railroad; that a "boom" extended from the cab of such crane across the north half of the highway and was about five feet above the ground; and "that it was dark and there was a heavy fog, so that the lights of the automobile of the plaintiff would fail to disclose this projection onto the highway located up above the range of the headlights."  It is alleged further the defendant neglected to have watchmen, maintain a suitable barricade, danger signs, and red lights warning plaintiff of such obstruction of the highway by such boom.

It is stated further by plaintiff in his second amended petition that:

"At or about 2:45 a. m. on the 7th day of April, 1948, with conditions existing as previously set forth herein, he was driving his 1940 Ford sedan in an easterly

direction along said Losantiville road; that as he approached the Pennsylvania railroad underpass he descended the grade approaching thereto, passed under said underpass and started up the grade on the east side of said overpass and saw the cab of this large crane and turned his car to the left onto the northerly half of the road or what would be known as the left hand side of the road to avoid a collision with said cab and bucket of said power crane and that as he was passing said power crane the boom heretofore described placed above the road and out of the range of his headlights struck the top and right side of this plaintiff's Ford automobile with such force as to totally demolish the same and injure this plaintiff as herein set forth.''

In a third cause of action plaintiff alleges the existence of a contract between the defendant and the county of Hamilton, whereby defendant was required to maintain suitable barricades, lights and a watchman for the protection of the public during and in connection with such installation of such sewer and that ''said defendant failed to provide, erect and maintain suitable barricades, danger signs and red lights and failed to provide adequate protection to insure the safety to the public at all times but on the contrary in violation of this duty imposed by contract for the benefit of this plaintiff and others using the highways, intentionally obstructed the highway with the boom hereinbefore described, causing the injury to the plaintiff set forth in the first cause of action and the damage to his automobile set forth in the second cause of action.''

The answer of the defendant is in effect a general denial.

Motions for an instructed verdict and for judgment *non obstante veredicto* and for a new trial were filed by defendant and overruled.

From the evidence introduced by plaintiff, it appears that defendant was, on April 7, 1948, engaged in the installation of a sewer just south of the center line of Losantiville road in the county of Hamilton. In connection with such work, a crane having a 45-foot boom extending from the cab of the crane was employed in the work. On the night in question, the cab was located just south of the center line of the road and the boom extended west from the cab. The western extremity of the boom extended some two or three feet across the center line into the north half of the highway, and such western end of the boom was about four or five feet above the level of the highway. The ditch in which the sewer was installed had been filled in for some considerable distance to the west of a point where plaintiff entered Losantiville road from the north out of Brook Crest avenue, at about 2:00 a. m., on the night of April 7, 1948. At the point where the cab and boom were located the ditch was still open.

The president of defendant company, being called as on cross-examination, stated that the boom was so located as a barricade against possible entrance into the ditch by vehicles using the north portion of the highway.

From the plaintiff's own testimony, the following statements indicate what happened. He stated:

"A. I was coming down Reading road, coming south on Reading road and I turned over Section, as I usually come over Section, or I mean over Losantiville, but on account of that fog, the night too bad, I decided I would turn off and come over the other road, because Section road is a narrow road. I came over Brook Crest. I turned right on Section to Brook Crest and from Brook Crest to Losantiville. And I proceeded down there very cautiously. It was a foggy night and I had my windshield wiper going, and I pro-

ceeded down on the right-hand side, which is the proper way to drive, and as I got down just about that underpass my lights were going down to the road street. There is a jog in the road along this underpass, and I saw this equipment in the distance, and when I discovered there was something going on, I stopped my car and tried to figure out what it was. I saw some red lights along the side. I thought I would check to see. I didn't know whether the road was blocked or whether you could get through or not, although there were no signs this way over this entire distance of any kind. So I turned, and the next thing I heard some scraping in the top, and I came to a sudden stop. I was not going very fast, and I got out of the car and here was this piece of equipment, boom, which was on the right side of my car and into the top of my windshield. So I got out of the car. Of course, I didn't know what was blocking the road, and the weather being bad.

"* * *

"A. I was driving very cautiously, slow, I would say not over twenty miles an hour, and when I got down to this, approached the underpass, then I stopped the car when I saw some lights, and those lights, they were upon this cab, which was quite a distance, and then I saw a couple of lights along the middle of the road. I immediately proceeded cautiously on the left hand side, very slowly. I didn't get very far when this boom, sticking out over the edge of the road, come in contact with the windshield and top of my car as the picture shows.

"Q. How high was the bottom of this boom from the road? A. I would say about the height of a car, about five feet, four to five feet.

"Q. How far, if you know, did it extend beyond the middle of the road, about? A. About, I would say,

two feet, two to two and a half feet from the center of the road to the north, to the north side of the road.

"Q. State whether or not you ever saw this boom before you hit? A. No; I didn't know it was there. I was watching the road due to the narrowness of it, and passing, trying to get around, my lights were down to the road.

"Q. What was the condition of the night? Was it a nice, clear night, or what kind of a night was it? A. It was foggy and misty, in fact, it was necessary to drive very slow, because you could not see, especially in low spots, where this particular place is. In the low places the fog hangs, it was necessary to have your windshield wiper going to keep it as clear as possible. '' * * *

"A. There was lights all along the ditch, the open ditch, where my car was standing.

"Q. You saw these lanterns all along the ditch? A. There were two or three of them, I don't know how many, along this open ditch.

"Q. As you were coming eastward on Losantiville road you saw in front of you a light at the open ditch, is that right? A. No.

"Q. None at all? A. I didn't see any lights there at all.

"Q. You did not see these concrete pipe, tile pipe, two by twelve—two by six across there? A. No.

"Q. You saw no light that night there? A. No, sir.

"Q. Where did you see these lights? A. I saw some lanterns hanging on the cab.

"Q. What cab? A. On the cab were some lanterns.

"Q. Then as you were driving along and looking at the road you saw lights on the cab some distance in front of you, is that right? A. Forty-five feet, I would say.

"Q. At least 45 feet in front of your car? A. Yes.

"Q. You did not see the open ditch in front of your car? A. No, sir.

"Q. You never saw the open ditch? A. Not until I got out of the car. After I got out of the car I saw the open ditch right alongside of the machine.

"Q. At a distance of 75 feet away, you mean you saw these lights on the cab?

"Mr. Skirvin: He didn't say 75 feet. He said 45.

"Q. I am sorry. I apologize. It was 45. A. Yes.

"Q. You saw these lights on this cab 45 feet away? A. That is right, after I got out of the car.

"Q. How? A. After I got out of the car I saw these lights up there.

"Q. You did not see them before the accident occurred? A. No; not until after I got out.

"Q. Then as you were driving along Losantiville road, going eastwardly, you saw nothing there, but you stopped your car and got out? A. That is right. I stopped at the underpass that turned into this road. I got to that underpass and stopped because I knew work of some kind was going on, but I didn't know what. That was the first time I had come over that road since—

"Q. (Interrupting) You saw something that made you stop. What was it? A. It was an object there, but I didn't know what it was. There was an object in the road, equipment of some kind.

"Q. Did you get out of your car? A. No, sir.

"Q. At that point? A. No, sir.

"Q. You stopped. A. I stopped, and then I turned to the left.

"Q. You had no knowledge what that was on the road, except there was something on the road? A. That is right.

"Q. After stopping you went to your left. What it was, you don't know? A. That is right.

"Q. After you came in contact with this boom, you saw these lights up on the cab. A. That is right.
"* * *

"Q. Your lights were in good condition this night. A. Yes, sir.

"Q. They were able to reveal substantial objects in front of you? A. That is right.

"Q. They were able to reveal the condition of the road in front of your car, were they not? A. The fog handicapped any condition of the road.

"Q. On this night with the lights you had on your car that night, how far in front of it could you see? A. I could not see any great distance.

"Q. On this night on Losantiville avenue, in what distance could you stop your car? A. If the brakes are in good shape, and my brakes had been relined, I could stop in a short distance.

"Q. How many feet? A. I could stop in 25 feet.

"Q. After you had stopped in the road, you don't know what it was, and from there then turned to the left to go on the left side of the road, you were in low gear? A. That is right.

"Q. How fast were you going at that time? A. About five miles an hour.

"Q. In what distance could you stop a car going five miles an hour? A. I could stop pretty quick, inside of ten or fifteen feet I imagine.

"Q. When you turned to your left—withdraw that. When you stopped your car, as you have testified, for whatever was there, you were certain that the road was impassable on the right side, is that right? A. That is right.

"Q. You didn't know whether it was impassable on the left now, did you? A. It was open on the left hand side, or appeared to be open. It was very confusing. The road is narrow. It was only about the width of a

car, and it was confusing, because of these lanterns along there, you had to pull off the road, and I was cautious because I was afraid I would have to pull off the road on the north side of the road.

"Q. There were lanterns along there at that time? A. There were lanterns along the ditch; yes.

"Q. You saw them when you stopped? A. When I stopped.

"Q. I think you told me a minute ago you did not see any lanterns until after the accident occurred. I am not trying to confuse you. I am just trying to get your story. I don't mean to be pestiferous at all, but you said to us, you said a little while ago there were no lanterns or anything you could see when you stopped? A. Leading up to this, there were no lanterns or signs leading to this equipment. There were no signs, barricades or warning signs. That road was not under construction on the right hand side.

"Q. There were no lights that you saw until after the accident occurred? A. That is right.

"Q. Then, when you stopped, and you pulled your car to the left side of the road you were not able to see on the left side of the road over farther—what was it you called that? A. Well, it was confusing. You could see, but it was very hazy. I didn't get very far after that. When this thing hit the top of my car, I tried to back the car away from it.

"Q. What I am getting at is, when you stopped your car, as you say, before you made this left turn to go to the left side of the road, you knew that the right side of the road was blocked? A. That is right.

"Q. You did not know whether the left side of the road was blocked? A. That is right.

"Q. You went to the left side? A. I went a distance of a few feet."

It must be evident from the plaintiff's own testimony

that he was guilty of negligence, proximately causing his injuries and damage to his automobile, and that he cannot, therefore, recover. *Winkler* v. *City of Columbus,* 149 Ohio St., 39, 77 N. E. (2d), 608. He drove his automobile into a visible static object in the path of the area covered by such automobile. He saw the boom when he got out of his car. Therefore, it was a visible object. It struck his car. Therefore, it was evidently in the path of the vehicle. If he had driven into the boom in broad daylight, it seems incredible that any contention could be made that he could recover. Therefore, it was the darkness, the fog, his confusion, and the speed of his car which prevented timely measures to avoid his injuries. These elements do not excuse him.

The Ohio statute, Section 6307-21, General Code, is conclusive upon this matter. It forbids *any* speed which will not permit the driver to stop his car within the *assured* clear distance ahead. That distance, by reason of darkness, fog, or other natural conditions may be *nothing,* in which case the speed must be nothing. If the driver cannot see that which is in his path, there is *no* assured clear distance ahead. There is essentially no difference in principle between the diminution of such assured clear distance by a bend in the road, the brow of a hill, blinding lights, darkness or a fog. Either the driver can see where he is going or he cannot. Much the same principle applies to persons who proceed in darkened areas and suffer injury by proceeding forward when they cannot see what lies in their path. In other words, they are the authors of their own injuries. Such rule is found in the so-called "step in the darkness cases." Inability to see what lies ahead, whether it be in the case of an individual or the driver of a motor vehicle, requires that the movement forward shall be appropriately decreased if necessary to a stop.

The rule that the plaintiff has a right to rely upon obedience of law by others may bear upon the question of negligence, but it has little, if any, application to contributory negligence.

It is unnecessary here to consider the question of whether under all the facts the defendant was negligent. This upon the evidence may have been a factual issue, which might sustain a reversal on the weight of the evidence. Upon the phase of plaintiff's negligence, we are concerned with a question of law. His violation of the statute and his evident movement into a static discernible object requires a finding that he was guilty of negligence contributing to his injuries as a matter of law. *Skinner* v. *Pennsylvania Rd. Co.,* 127 Ohio St., 69, 186 N. E., 722; *Glasco* v. *Mendelman.* 143 Ohio St., 649, 653, 56 N. E. (2d), 210.

In *Gumley* v. *Cowman,* 129 Ohio St., 36, 193 N. E., 627, it is stated in the second paragraph of the syllabus:

"The present legislative requirement establishes a subjective test whereby a driver is prohibited from operating any motor vehicle in and upon any public road or highway at a rate of speed greater than will permit him to bring it to a stop within the distance at which he can see a discernible object obstructing his path."

In *Kormos* v. *Cleveland Retail Credit Men's Co.,* 131 Ohio St., 471, 3 N. E. (2d), 427, it is said in paragraph three of the syllabus:

"Any operator who has failed to comply with the 'assured clear distance' statute may excuse such failure and avoid the legal imputation of negligence per se by establishing that, without his fault, and because of circumstances over which he had no control, compliance with the law was rendered impossible."

In the instant case, according to plaintiff's own tes-

timony he had ample warning that a dangerous condition existed in the highway. To leave to the jury the right to speculate upon whether the plaintiff exercised proper care in proceeding is to negative the evident intent of the Legislature to permit operation of a motor vehicle upon a highway only when the driver can see where he is going and what is in his path. If he cannot see, as the plaintiff states he could not, still proceeding constitutes a violation of the statute. No sudden emergency is here involved. There is no sudden or unexpected *entrance* of an object into the path in which plaintiff was proceeding. The plaintiff obviously knew he was in an area of danger, where his lights were of little value, and still he drove his automobile into a static object fully discernible, except for fog, darkness, and distance.

The Supreme Court later in *Smiley* v. *Arrow Spring Bed Co.*, 138 Ohio St., 81, 33 N. E. (2d), 3, stated the modern rule herein applicable.

"Section 12603, General Code, is a safety measure which, to accomplish its purpose, must be applied according to its clear and unambiguous language.

"To comply with the assured-clear-distance-ahead provision of Section 12603, General Code, the driver of a motor vehicle must not operate it at a greater speed than will permit him to bring it to a stop within the distance between his motor vehicle and a discernible object obstructing his path or line of travel, unless such assured clear distance ahead is, without his fault, suddenly cut down or lessened by the entrance, within such clear distance ahead and into his path or line of travel, of some obstruction which renders him unable, in the exercise of ordinary care, to avoid colliding therewith."

On pages 88 *et seq.* of the opinion, many cases similar to that here presented are cited showing the rule

applicable. Claim is made because the west end of the boom was above the road level the principles herein stated do not apply. No reason is apparent for such claim. Obviously it was in the area occupied by the car as it proceeded and could have been seen as it *was* seen by plaintiff when he came out of his car.

The conclusion of the court in the premises requires that a final order in favor of the defendant be entered in this court. Such conclusion renders unnecessary any ruling on other assignments of error presented.

> *Judgment reversed and final judgment for appellant.*

Ross, P. J., and Matthews, J., concur in the syllabus, opinion and judgment.

Hildebrant, J., dissenting. I respectfully dissent from the majority opinion of the court.

The circumstances of this case impress me as sufficient to legally excuse the plaintiff from the application of the ''assured-clear-distance-ahead'' rule.

Approaching the barricade across his right lane, he exercised due care, and stopped within the assured clear distance ahead. He is charged at this point with observing the entire discernible barricade presented to view, including the boom, crane, lights, etc., which was incident to a ditch construction job. He was, therefore, apprised that the danger barricaded against was an open ditch below the surface of the street or the mound created by the back filling thereof.

The left or north half of the street was open, so that in conjunction with the barricade on the right, it amounted to an invitation tantamount to an audible direction for traffic to proceed at this point over the north half of the road.

Required to go to his left, plaintiff proceeded as any ordinarily prudent person would do, and turned sharply left in low gear to the left half of the highway. At this point, his assured clear distance was only the width of the left half of the street. He was, therefore, required almost immediately to turn right and straighten his vehicle into the traveled portion of the left half of the street and under the fresh impetus of his low gear, and possibly, from the record, before he had traveled the distance within the range of his lights and before the lights had completed their swing to the right, so as to illuminate the whole width of the north half of the street, his vehicle collided with the diminished end or area of the boom projecting and suspended several feet in the air into the path to which plaintiff had been directed, and before he had time to discern the not easily discernible dark object which was the diminished area presented by the end of the boom.

It seems to me that plaintiff was not required to anticipate, particularly after being apprised that the danger to be apprehended lay at the surface of and below the street, that a veritable trap in the form of the end of a crane boom would be suspended in midair at the right edge of the lane of traffic, which he was directed and required to use.

The situation here seems similar to that in *Hangen, a Minor,* v. *Hadfield,* 135 Ohio St., 281, 20 N. E. (2d), 715, wherein it is said in the third paragraph of the syllabus:

"These provisions of Section 12603, General Code, do not require the driver of a motor vehicle approaching the crest of a hill on a public highway to anticipate that his proper path will be obstructed by another automobile driven in the opposite direction in a manner contrary to law."

The case of *Farris* v. *City of Columbus,* 85 Ohio App., 385, 85 N. E. (2d), 605, seems a somewhat similar and exceptional case, wherein it was held in the third, fourth and fifth paragraphs of the syllabus:

''3. The 'assured clear distance ahead' rule is not applicable unless it be shown that the obstruction or defect which caused the accident is discernible, and discernible in time to permit the driver to avoid it.

''4. The 'assured clear distance ahead' rule has no application where the obstacle in front is for the first time in the driver's view, after the vehicle has passed the point where the rule would be effective, and the obstacle is then too close to be avoided.

''5. Where the plaintiff, riding on a motorcycle, was following an automobile at a reasonable distance, and where both vehicles were traveling at a reasonable and lawful rate of speed, and where the automobile suddenly swerved from its path to avoid striking a hole in the street, the hole for the first time coming into the plaintiff's view, after the plaintiff was too close to avoid striking the hole, the 'assured clear distance ahead' rule has no application.''

Summing up, it seems to me that in the act of swinging sharply left around the end of the barricade and straightening his vehicle sharply right into the lane of travel, the end of the boom, negligently suspended over the traveled portion of that half of the road, was, in effect, projected into the distance ahead of plaintiff so suddenly that the element of lack of time involved provides a legal excuse from the strict application of the doctrine of assured clear distance ahead.

I, therefore, think that a jury question was presented.